A03A1223. LITTLE SKY, INC. et al. v. RYBKA et al.
(592 SE2d 154)

BLACKBURN, Presiding Judge.

Following the grant of summary judgment to Wayne Patterson and Robert Rybka (the "sellers") in their suit against Little Sky, Inc.

---

("Little Sky"), Vincent Tresham, and Patricia Zacharchuk (collectively the "buyers") for nonpayment of purchase-money promissory notes, the buyers appeal, arguing that the trial court erred in granting summary judgment because: (1) the sellers' fraud entitled the buyers to an abatement of the purchase price; (2) partial failure of consideration entitled the buyers to an abatement of the purchase price; and (3) the statute of limitation on the notes expired before the suit was filed. For the reasons which follow, we affirm.

Tresham and Zacharchuk, as president and secretary respectively of Little Sky, entered into a contract to purchase the assets of a Healthcare Recruiters International, Inc. ("Healthcare Recruiters") franchise from Patterson and Rybka, whose corporation, Big Sky, Inc. ("Big Sky"), owned and operated the franchise. The sale was partially financed by two promissory notes, one for $20,000 and the other for $55,000, executed by Little Sky and personally guaranteed by Tresham and Zacharchuk. The notes were payable in eight semiannual installments beginning in September 1992, and finally due and payable in March 1996.

At the time the parties were negotiating the sale, Zacharchuk had been employed by Big Sky for five years, and as manager of the Atlanta office, she was intimately familiar with the business of the franchise. As office manager, Zacharchuk received on a regular basis notice of owners' meetings and the minutes of those meetings. Prior to the closing of the sale of the franchise, Zacharchuk discovered that minutes of some of the franchise owners' meetings were being withheld from her. When she inquired about the reason for this, the sellers told her that the buyers were not yet on the mailing list for the minutes because they were not yet owners. Shortly before the closing of the sale, several checks from the Healthcare Recruiters home office bounced. The buyers also inquired about these checks; they were told by the sellers that the checks had bounced because of bookkeeping errors and that there was no need for concern. The buyers made no further investigation.

On October 24, 1991, the buyers proceeded with the closing on the franchise, with Tresham and Zacharchuk signing as guarantors on the two promissory notes which are at issue in this case. Shortly thereafter, Zacharchuk discovered that the owners' meetings for which she had not received minutes concerned misappropriation of funds by the president of Healthcare Recruiters. Zacharchuk testified that the misappropriation of funds later caused the franchise's gross revenues for 1992 to drop precipitously.

On December 5, 1991, the buyers received notice from both the State of Georgia and the Internal Revenue Service that employment taxes were due from Big Sky. While they requested that Big Sky pay the taxes due, the buyers eventually paid the state and federal

employment taxes when Big Sky failed to do so. In July 1992, the buyers wrote to the sellers demanding that the sellers pay, pursuant to the contract, a $10,000 transfer fee to Healthcare Recruiters. The sellers did not respond to this request.

Despite the problems they claim to have had with the sellers, the buyers continued to make sporadic payments on the promissory notes. In May 1993, the sellers informed the buyers by letter that they were in default on the promissory notes. In response, the buyers continued to make payments on the promissory notes and attempted to renegotiate the contract. Following the letter of May 1993, the buyers made payments on September 8, 1993 ($6,000), December 30, 1994 ($3,000), June 4, 1995 ($2,000), September 22, 1995 ($2,000), February 2, 1996 ($2,000), and August 1, 1996 ($4,000).

As indicated above, the last payment on the promissory notes was made on August 1, 1996. The sellers filed suit for the remaining amounts due under the notes, together with interest, attorney fees, and court costs, on September 25, 2000. The buyers answered, alleging, among other things, fraud as a defense. Citing *Jernigan Auto Parts v. Commercial State Bank*,[1] the trial court ruled that defendants waived their defense of fraud by making payments on the notes after learning of the financial improprieties at the home office rather than rescinding the sales contract for fraud, suing plaintiffs for breach of contract, or terminating the contract under paragraph 13. As a result, the court awarded summary judgment to plaintiffs in the principal amount of $69,852.22, together with $58,371.75 interest and $19,233.60 attorney fees.

1. The buyers argue in their first enumeration of error that the sellers' fraudulent conduct entitled them to an abatement of the purchase price. We do not agree.

As in *Jernigan Auto*, supra, the gravamen of the buyers' position is that they should be relieved from paying the balance on the notes because of fraud on the part of the sellers which induced them to purchase the franchise and to execute the promissory notes. They claim that they discovered this fraud in 1991, yet they continued to make payments on both notes, as late as August 1996.

> It is a well settled rule that if a party who is entitled to rescind a contract because of fraud or false representation, when he has full knowledge of all the material circumstances of the case[,] freely and advisedly does anything which amounts to the recognition of the transaction, or acts in a manner inconsistent with its repudiation, it amounts to

---

[1] *Jernigan Auto Parts v. Commercial State Bank*, 186 Ga. App. 267 (367 SE2d 250) (1988).

acquiescence, and, though originally impeachable, the contract becomes unimpeachable even in equity. It is incumbent upon a party who attempts to rescind a contract for fraud to repudiate it promptly on discovery of the fraud. If he does not, he will be held to have waived any objection, and to be conclusively bound by the contract as if no fraud or mistake had occurred.

(Citations and punctuation omitted.) Id. at 271 (3). The *Jernigan Auto* court goes on to state that "[e]ven accepting defendants' evidence as undisputed that the notes were entered into because of the bank officer's fraud, the bank was still entitled to judgment because defendants waived the fraud and ratified the notes by their silence after they learned of the officer's objected-to actions and by their subsequent payments on the notes." Id.

A buyer has an election of remedies, i.e., to rescind the contract and sue in tort, or to affirm the contract and sue for damages. See *Conway v. Romarion*.[2] Here, however, the buyers made no election. It is clear from the record that they never brought suit. Their conduct in making the partial payments, far from being an election, instead constituted a waiver of any claim of fraud. See id. As the trial court noted in its order,

Defendants did not pursue any remedy for the fraud they allege was committed by Plaintiffs. Defendants knew that there were problems with the home office before the closing of the sale. By their own admissions, Defendants knew of the fraud shortly after the closing of the sale of the franchise. Defendants continued to make payments until 1996, some five years after the completion of the sale of the business. Further, Defendants admit to attempting to renegotiate the terms of the contract. Even after Defendants were given notice of their default, they still did not attempt to rescind the contract, nor did Defendants sue Plaintiffs for breach of contract. Further, under section 13 of the Contract for Sale of Business signed by the parties, Defendants had the right to terminate the contract within a year of the date of sale. This is yet another remedy which was available to the Defendants for Plaintiffs' alleged fraud, and yet again Defendants made no attempt to utilize the remedies made available to them by law.

The trial court might also have added that it was only in their answer to the sellers' complaint, filed nine years after the closing of

---

[2] *Conway v. Romarion*, 252 Ga. App. 528 (557 SE2d 54) (2001).

the sale, that the buyers asserted fraud on the part of the sellers. Thus, even if it could reasonably be said that the buyers made an election, we fail to see how such an election could be considered prompt, as required by our case law. *Jernigan Auto,* supra at 271 ("[i]t is incumbent upon a party who attempts to rescind a contract for fraud to repudiate it promptly on discovery of the fraud"); see also *Woodall v. Beauchamp*[3] (year-long silence following full knowledge of the alleged fraud constituted waiver of any objection). In sum, as the trial court observed, the buyers' actions are inconsistent with their claims of fraud. Given these facts, it is clear that the trial court did not err in finding that the buyers had waived any claims of fraud.

2. The buyers assert that a partial failure of consideration entitled them to an abatement of the purchase price, explaining this assertion only by stating that the trial court was not justified in refusing "to credit the buyers for the sellers' failure to make approximately $16,000 in payments it was obliged to make under the terms of the parties' contract," and "to allow a jury trial, under a partial failure of consideration theory, on buyers' contention that they got less than they bargained for." The buyers, however, fail to provide record citations to evidence necessary to evaluate the validity of their arguments. Accordingly, this enumeration of error is deemed abandoned. Court of Appeals Rule 27 (c).

3. Finally, the buyers argue that the sellers' suit was filed outside the six-year statute of limitation because the sellers had exercised their option to accelerate the notes in phone calls made to the buyers after the letter of May 1993, thus requiring the filing of suit by 1999. Again, we disagree.

The notes give the sellers an election to accelerate maturity of the debt. "[I]f maturity was in fact accelerated, the statute of limitations began to run from the time of the election to accelerate rather than on the date the last installment was due; . . . the question for the jury was one of whether or not the [sellers] had accelerated maturity." *Wall v. C & S Bank of Houston County.*[4]

Because the sellers had an election as to acceleration, the entire indebtedness did not ipso facto become due upon the buyers' default. Instead, it was

> necessary that some affirmative action be taken by the creditor evidencing his intention to take advantage of the acceleration clause; otherwise the provision has no operation, and the debtor has a right to tender the sums in default. The creditor cannot in his own mind effectively exercise the

---

[3] *Woodall v. Beauchamp,* 142 Ga. App. 543, 545 (1) (236 SE2d 529) (1977).
[4] *Wall v. C & S Bank of Houston County,* 247 Ga. 216-217 (1) (274 SE2d 486) (1981).

option to declare the whole principal due; he must communicate his decision to the debtor, or manifest it by some outward affirmative act sufficient to constitute notice of his election, such as service of notice of attorney's fees, the filing of suit for the entire debt, written notice of his exercise of the option, or by advertisement under the power of sale, to collect the entire principal.

(Citations omitted.) *Lee v. O'Quinn.*[5]

The affirmative actions enumerated in *Lee* are actions of a legal nature, not mere declarations of intent. In this case, the sellers did not take the sort of outward affirmative action that was sufficient, under *Lee*, to constitute notice of their election to accelerate the debt. The letter of May 14, 1993, sent to the buyers by the sellers' attorney was certainly not sufficient notice. That letter advises the buyers that the sellers will accelerate the notes if payment is not made, and expressly states that the fact that the sellers have written "does not in any way waive their rights to declare the notes in default, accelerate the maturity of the notes and attorney's fees."

The buyers also assert in their affidavits that the sellers followed up the letter of May 1993 with phone calls in which they made "demands to the effect 'you are in total default, pay up, we are taking the business back, all payments are now due.'" These assertions, unspecific as to the date on which the calls were made, also do not constitute the outward affirmative action contemplated by *Lee* or provide a specific date from which the buyers say the statute of limitation should have run. Added to this is the fact that the buyers did not appear to believe that payment of the promissory notes had actually been accelerated since they continued to make payments on the promissory notes. In light of these facts, the trial court was authorized to find that the sellers' claims were not defeated by the statute of limitation.

*Judgment affirmed. Smith, C. J., Andrews, P. J., and Ruffin, P. J., concur. Miller, Ellington and Phipps, JJ., dissent.*

PHIPPS, Judge, dissenting.

I respectfully dissent from the majority's affirmance of the trial court's grant of summary judgment to the sellers of a business in this suit against the buyers for nonpayment of purchase-money promissory notes.

1. In Division 1 of its opinion, the majority, in reliance on *Jernigan Auto Parts v. Commercial State Bank,*[6] concludes that the conduct of the buyers, Tresham and Zacharchuk, in making partial pay-

[5] *Lee v. O'Quinn*, 184 Ga. 44, 45 (2) (190 SE 564) (1937).
[6] 186 Ga. App. 267 (367 SE2d 250) (1988).

ments on the promissory notes constituted a waiver of any claim of fraud. I cannot agree, and I find *Jernigan Auto Parts* distinguishable.

(a) In *Jernigan Auto*, the buyers of a business waived their claim that they had been fraudulently induced to make the purchase "by their silence" after they learned of the alleged fraud and by their subsequent payments on the purchase-money notes.[7] Here, the buyers did not remain silent.[8] Rather, they protested that the sellers, Wayne Patterson and Robert Rybka, had concealed material facts devaluing the business and made only partial payments on the purchase-money notes. It is true that the buyers' recognition of the transaction constituted a waiver of any right to rescind it. As held in *Jernigan Auto*,

> It is a well settled rule that if a party who is entitled to rescind a contract because of fraud or false representation, when he has full knowledge of all the material circumstances of the case[,] freely and advisedly does anything which amounts to the recognition of the transaction, or acts in a manner inconsistent with its repudiation, it amounts to acquiescence, and, though originally impeachable, the contract becomes unimpeachable even in equity. It is incumbent upon a party who attempts to rescind a contract for fraud to repudiate it promptly on discovery of the fraud. . . . [If he does not, h]e will be held to have waived any objection, and to be conclusively bound by the contract as if no fraud or mistake had occurred.[9]

However, as recognized in cases such as *Conway v. Romarion*,[10]

> [a] purchaser who claims that he was fraudulently induced to enter into a sales contract has an election of remedies. The first option is to rescind the contract after discovering the fraud and sue in tort to recover the purchase price and any additional damages from the fraud. Alternatively, the purchaser may elect to affirm the contract and sue for damages resulting from the fraud.[11]

Here, the purchasers elected to affirm the contract, rather than to rescind or attempt to terminate it,[12] and to recover their damages

---

[7] Id. at 271 (3).

[8] Compare *Woodall v. Beauchamp*, 142 Ga. App. 543, 545 (1) (236 SE2d 529) (1977).

[9] (Citations omitted.) Id.

[10] 252 Ga. App. 528 (557 SE2d 54) (2001).

[11] Id. at 530 (1).

[12] Termination of the contract under paragraph 13 would not appear to have been authorized, as there is no evidence that any civil, criminal, or bankruptcy action was brought as a result of misappropriation of funds by Healthcare Recruiters International, Inc.'s president.

by making only partial payments on the purchase-money promissory notes. In *Atlanta Car Wash v. Schwab*,[13] the Supreme Court of Georgia sanctioned such a course of action. There, the Court held that partial payment of a purchase-money promissory note does not operate as a waiver of fraud by a purchaser electing to affirm the contract rather than rescind it, unless the purchaser engages in conduct condoning the fraud.[14] Here, the purchasers engaged in no such conduct. Under these circumstances, their failure to sue the sellers for damages should not bar them from pleading partial failure of consideration in recoupment of the damages the sellers now seek to recover against them.[15] In my opinion, the majority's holding to the contrary is inconsistent with *Atlanta Car Wash v. Schwab*, a decision the majority fails to cite.

(b) Another difficult issue presented by this case but not addressed by the majority is whether the buyers' fraud claim is barred by the merger clause in the parties' contract. I conclude that it is not.

It is true that if a party claiming he was fraudulently induced to enter a contract chooses to affirm the contract rather than to rescind, "he is bound by its terms, including the provisions of a merger clause."[16] And it has been broadly held that a "merger clause" (a term also used to refer to a disclaimer provision)[17]

> prevent[s] a fraud-in-the-inducement defense unless it can be shown that the party claiming fraud lacked knowledge of the contract's contents. [Cit.] Where a purchaser affirms a

---

[13] 215 Ga. 319, 321 (2) (110 SE2d 341) (1959), citing *Tuttle v. Stovall*, 134 Ga. 325 (67 SE 806) (1910).

[14] Accord *Camp v. Hatcher*, 119 Ga. App. 63 (166 SE2d 422) (1969).

[15] See *Toole v. Brownlow & Sons Co.*, 151 Ga. App. 292, 294 (1) (259 SE2d 691) (1979); OCGA § 13-7-2.

[16] (Footnote omitted.) *Lakeside Investments Group v. Allen*, 253 Ga. App. 448, 451 (2) (a) (559 SE2d 491) (2002).

[17] See *Meadow River Lumber Co. v. Univ. of Ga. Research Foundation*, 233 Ga. App. 169, 173, n. 16 (503 SE2d 655) (1998). A merger or entire agreement clause provides in essence that the parties' written contract contains the entire agreement between the parties and that all prior oral agreements or promises are merged into the written agreement. See *Nixon v. Sandy Springs Fitness Center*, 167 Ga. App. 272 (2) (306 SE2d 362) (1983) (plaintiff could not claim she had been fraudulently induced to enter into health club membership agreement by health club's promise to satisfy her outstanding debt to another club where agreement contained no such promise); *Spires v. Relco, Inc.*, 165 Ga. App. 4, 5 (2) (299 SE2d 58) (1983) (lessee precluded from claiming that lessor fraudulently induced him to enter into lease by promising to perform certain services, where such promises were not part of contract). A disclaimer provision in essence provides that no representations, promises, or inducements not included in the written contract bind any party. See *Carpenter v. Curtis*, 196 Ga. App. 234 (395 SE2d 653) (1990) (plaintiff could not claim that defendant had induced him to enter into purchase agreement by misrepresenting value of equipment and inventory, where agreement contained no representations as to value of equipment or inventory).

contract containing a merger provision, "he is estopped from asserting that he relied upon the seller's misrepresentation and his action for fraud must fail." [Cit.][18]

There is, however, an exception to the rule that a merger clause bars a claim or defense of fraud.

If there is a concealed defect, known to the seller, in property being sold, the seller is bound to reveal it to the purchaser (cits.); and although the purchaser signs a contract of sale which provides that it contains the entire agreement between the parties and that no representation, statement, or inducement except as therein noted shall be binding upon either party, this provision does not relieve the seller from performing his duty to disclose the concealed defect to the purchaser, either by a statement in the contract or otherwise. Concealment of material facts may amount to fraud when direct inquiry is made, and the truth evaded, or where the concealment is of intrinsic qualities of the article which the other party by the exercise of ordinary prudence and caution could not discover. . . . [Cit.][19]

In this case, a jury would be authorized to find that Tresham and Zacharchuk made direct inquiry concerning financial irregularities occurring at the franchisor's home office, and that Rybka and Patterson evaded the truth and actively sought to conceal it by misrepresenting the reason checks were being dishonored and by preventing Zacharchuk from receiving documentation revealing the truth. Although there may have been no intrinsic product defect in this case, a jury could find that there was a concealment of material facts and evasion of the truth in response to a direct inquiry about the matter concealed and that the language in this merger clause does not bar a claim of fraud based on these facts.[20] Under the circumstances, whether the merger clause in the parties' agreement bars Tresham and Zacharchuk's fraud defense is a jury question.

2. The buyers also contend that the sellers were not entitled to summary judgment on their defense of partial failure of consideration.

---

[18] *Carpenter v. Curtis*, supra, 196 Ga. App. at 236; see *Great American Builders v. Howard*, 207 Ga. App. 236, 239 (1) (427 SE2d 588) (1993) (notwithstanding variations in language employed in merger or entire agreement clause, it has been generally held that contract containing such a clause bars plaintiff electing to affirm contract from claiming he was fraudulently induced to enter into contract by verbal misrepresentations of other party).

[19] (Punctuation omitted.) *Batey v. Stone*, 127 Ga. App. 81-82 (192 SE2d 528) (1972).

[20] See *Gaines v. Crompton & Knowles Corp.*, 190 Ga. App. 863, 866 (4) (C) (380 SE2d 498) (1989).

In Division 2 of its opinion, the majority refuses to consider the merits of this claim of error on the ground that the buyers have failed to provide necessary record citations to evidence. I cannot agree. Pages 117 and 119 of the record, cited by the buyers on pages 1 and 3 of their brief, contain: (1) testimony by Zacharchuk that in 1991 and 1992, Rybka and Patterson breached the parties' sales contract by refusing to pay $6,516.37 in state and federal employment taxes and a $10,000 fee for transfer of the franchise, thereby requiring her and Tresham to pay those sums; and (2) the provisions of the contract requiring the sellers' payment of these items.

"Proof of total or partial failure of consideration entitles defendant to an abatement of purchase price to the extent that the consideration may have failed. [Cits.]"[21] Rybka and Patterson do not dispute this proposition. Instead, citing to various parts of the record, they argue that the tax payments Tresham and Zacharchuk contend they made were credited to the unpaid balance of the notes. This argument is wholly without merit. The record shows that Tresham and Zacharchuk were credited with payments of principal in the amounts of $3,441.30 and $1,706.48 in 1993, thereby reducing the principal indebtedness of the $20,000 and $55,000 notes to $69,852.22 (the principal amount awarded Rybka and Patterson by the trial court). The record shows no credit for any tax payment of $6,516.37 in 1991 or 1992, which is the amount and time period of the tax payments claimed by Tresham and Zacharchuk. As to Rybka and Patterson's nonpayment of the $10,000 franchise transfer fee, they argue that Tresham and Zacharchuk could not have been damaged by that because this fee was payable to Healthcare Recruiters International, Inc. and not to Tresham and Zacharchuk. Tresham and Zacharchuk have, however, presented evidence that they were damaged in the amount of $10,000 because they became obligated to pay the fee to HRI.

3. Finally, in Division 3, the majority rejects the buyers' argument that the sellers were not entitled to summary judgment on their statute of limitation defense. Again, I cannot agree.

An action on a promissory note must be brought within six years after a note becomes due and payable unless the holder of the note elects to exercise an option to accelerate the maturity of the debt, in which case the statute of limitation begins to run from the time of

---

[21] *Speir v. Nicholson*, 202 Ga. App. 405, 408 (2) (414 SE2d 533) (1992); compare *Nat. City Bank of Rome v. Busbin*, 175 Ga. App. 103, 106 (3) (332 SE2d 678) (1985) (involving a set-off which must be asserted by way of counterclaim, as opposed to a failure of consideration defense).

such election.[22] *Lee v. O'Quinn*,[23] relied on by the majority, holds that to effectively exercise an option to declare the whole debt due, the creditor

> must communicate his decision to the debtor, *or* manifest it by some outward affirmative act sufficient to constitute notice of his election, such as service of notice of attorney's fees, the filing of [the] suit for the entire debt, written notice of his exercise of the option, or by advertisement under the power of sale, to collect the entire principal.[24]

Zacharchuk testified the sellers' May 1993 letter was followed by numerous telephone calls from the sellers declaring her and Tresham in "total default" on the notes and demanding payment of all sums owed. If this testimony is to be believed, which it must be on motion for summary judgment, the sellers communicated a decision to the debtors to accelerate the debt, one of numerous alternative methods specifically sanctioned by *Lee*. The sellers brought this suit in September 2000, almost seven and one-half years after the 1993 letter was sent. Contrary to the majority's holding, in my opinion a jury would thus be authorized to find that the sellers communicated to the buyers a decision to accelerate the maturity of the debt more than six years before bringing this suit. The notes did not require written notice of acceleration.[25] And Rybka and Patterson's assertion of the acceleration clause, even if legally unauthorized, would still have begun the running of the statute of limitation.[26]

I am authorized to state that Judge Miller and Judge Ellington join in this dissent.

[22] *Wall v. C & S Bank of Houston County*, 153 Ga. App. 29, 31 (4) (264 SE2d 523) (1980) (citing OCGA § 9-3-24), aff'd, 247 Ga. 216 (1) (274 SE2d 486) (1981), but later rev'd on other grounds, *McKeever v. State of Ga.*, 189 Ga. App. 445, 446 (375 SE2d 899) (1988).

[23] 184 Ga. 44 (190 SE 564) (1937).

[24] (Citations omitted; emphasis supplied.) Id. at 45 (2).

[25] See *Fuller v. Greenville Banking Co.*, 230 Ga. App. 63, 64 (495 SE2d 320) (1997); compare *Rapps v. Cooke*, 246 Ga. App. 251, 252 (540 SE2d 241) (2000).

[26] See *Williams v. Sessions*, 171 Ga. App. 662, 663 (1) (320 SE2d 791) (1984) (assertion of acceleration clause based on breach of original terms of note unauthorized, where parties had entered into a quasi new agreement); *Wall v. C & S Bank*, supra, 153 Ga. App. at 31 (4) (if creditor elects to exercise option to accelerate maturity of debt, statute of limitation begins to run from time of such election).

DECIDED DECEMBER 1, 2003 —
RECONSIDERATION DENIED DECEMBER 16, 2003 — 

*Fred L. Cavalli, Christopher J. McFadden,* for appellants.
*Sturgeon, Harbin & Bowen, Gregory W. Sturgeon,* for appellees.